Filed 10/29/14  P. v. Villa CA4/2

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E060586 |
| v. | (Super.Ct.No. FVI1102623) |
| JOSEPH VILLA, | **OPINION** |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  R. Glenn Yabuno, Judge.  Affirmed.

Richard de la Sota, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

1

# I

## STATEMENT OF THE CASE

On January 9, 2013, an information charged defendant and appellant Joseph Villa and co-defendant Angela Lucia Sanchez[1] with first-degree murder under Penal Code[2] section 187, subdivision (a) (count 1); and kidnapping under section 207, subdivision (a) (count 2). As to both counts, the information also alleged that (1) defendant personally and intentionally discharged a firearm, a handgun, which caused great bodily injury and death within the meaning of section 12022.53, subdivision (d), causing the above offense to become a serious felony under section 1192.7, subdivision (c)(8) and a violent felony within the meaning of section 667.5, subdivision (c)(8); (2) defendant personally used a firearm , a handgun, within the meaning of section 12022.53, subdivision (b), also causing the above offense to become a serious felony under section 1192.7, subdivision (c)(8) and a violent felony within the meaning of section 667.5, subdivision (c)(8); (3) defendant personally used a firearm, to wit, a handgun, within the meaning of section 1203.06, subdivision (a)(1) and 12022.5, subdivision (a), also causing the above offense to become a serious felony pursuant to section 1192.7, subdivision (c)(8) and a violent felony within the meaning of section 667.5, subdivision (c)(8); and (4) a principal in said offense was armed with a firearm, to wit, handgun, said arming not being an element of the above offense, within the meaning of section 12022, subdivision (a)(1).

---

[1] Co-defendant Angela Lucia Sanchez is not a party to this appeal.
[2] All statutory references are to the Penal Code unless otherwise specified.

Following a trial, the jury convicted defendant of one count of first-degree murder under section 187 (count 1), and one count of kidnapping under section 207 (count 2). The jury also found true (1) as to each count that defendant personally discharged a firearm resulting in the death of the victim within the meaning of section 12022.53, subdivision (d); and (2) as to count 1, that defendant used a firearm within the meaning of section 12022.5.[3]

The trial court sentenced defendant to an indeterminate term of 50 years to life, as follows: 25 years to life for the first-degree murder charge in count 1, and a consecutive term of 25 years to life for the section 12022.53, subdivision (d), allegation as to that count. Pursuant to section 654, the court stayed the prison terms for the offense and section 12022.53, subdivision (d), allegation as to count 2, as well as the section 12022.5 allegation as to count 1.

On February 7, 2014, defendant filed a timely notice of appeal from a final judgment.

---

[3]     Defendant and co-defendant were tried together with separate juries. Co-defendant's jury was unable to reach a Verdict and the trial court declared a mistrial as to her case on December 18, 2013.

## II

## STATEMENT OF FACTS

On May 17, 2011, at 3:45 p.m., San Bernardino County Sheriff's deputies were called to an area known as the Deep Creek Spillway in Apple Valley, California. When they arrived, they saw emergency personnel working on a female, later identified as Raquel Rayas (the victim), lying on her back near the spillway itself. She had one gunshot wound to her shoulder and one to her head. She was breathing but unresponsive. She was wearing a sweatshirt over another shirt, pants, and socks. She was not wearing shoes and no shoes were found in the area. The victim was transported by ambulance to Antelope Valley Hospital in Lancaster. She was then airlifted to Adelanto Valley Hospital, where she died.

The autopsy surgeon, Dr. Frank Sheridan, found that the cause of the victim's death was gunshot wounds to the head and neck. The head wound was "clearly lethal," and the neck wound "had the potential to be lethal." The neck wound's path was left to right and slightly upward. The bullet was recovered from the sixth cervical vertebra. The head wound had an entry point in the left temple in front of the ear. That bullet traveled through the left side of the brain, through the midline of the brain, and came to rest on the right side of the brain.

Responding deputies found an expended .22 caliber shell casing near the victim's body, and two slugs were recovered from her body at the autopsy, one from her neck and

4

one from her brain. Detective Ryan Ford took a buccal swab from defendant on May 26, 2011 for use in DNA testing.

On June 1, 2011, Detective Ford and other law enforcement personnel served search warrants at homes on Bear Valley Boulevard in Apple Valley, and Itoya Vista Drive in Apple Valley. The Itoya Vista address was about 150 yards from the Bear Valley address; it was defendant's "previous address." The Bear Valley house belonged to defendant's parents, Richard and Amparo Villa. It appears that defendant stayed with his parents for "two days, three days" after May 26, 2011, then "went down the hill and . . . came back [and] stayed here and there."

The deputies recovered a Beretta .22 caliber handgun from a shelving unit outside the Bear Valley address. There was one live cartridge in the magazine. Other live cartridges were also located in the same area of the Bear Valley address. The Beretta was swabbed for DNA.

Hazel Whitworth, a firearms examiner from the San Bernardino County Sheriff's Department crime lab, compared the expended shall casing found at the Deep Creek Spillway crime scene with cartridges that she test-fired from the Beretta pistol recovered at the Bear Valley residence. She determined that the expended casing from the crime scene was fired from the Beretta pistol.

Jon Souw was a DNA expert in the forensic biology unit of the San Bernardino County Sheriff's crime lab. Souw developed DNA profiles from swabs taken from defendant and the victim, among others. He also analyzed the swabs taken from the

Beretta handgun. Souw found that there was a major contributor and a minor contributor of the DNA found on the trigger and the slide of the Beretta. Souw developed a DNA profile of the major contributor. Defendant could not be excluded as the major contributor to those samples, while the others were excluded as contributors. No DNA profile could be developed for the minor contributor from either location of the gun.

Detective Ford interviewed defendant on November 14, 2011, at the sheriff's headquarters in San Bernardino. The interview was recorded by an audio recorder and by a video surveillance system. Defendant told Detective Ford that his girlfriend and the mother of his three children had just left him. Thereafter, the victim stayed with defendant for a couple of days. He and the victim had sex a couple of times and she wanted to move in with defendant. He refused because he was hoping to get back together with his girlfriend. The last time defendant saw the victim was when he dropped her off at her mother's house. Defendant denied killing the victim and denied that the gun that killed her was his gun.

After Detective Ford insisted that defendant had killed the victim, defendant told the detective that "Angie" (co-defendant) had shot the victim, and that he "went for the ride." He was "just . . . at the wrong place at the wrong time." Defendant said that Angie and the victim were "boxing" and that he told Angie that they should take her home. Instead, Angie took the victim to Deep Creek. Angie had a gun that defendant used to own; he sold it. Angie and the victim argued all the way to Deep Creek.

6

When they got to Deep Creek, defendant said that he heard two shots from behind some bushes. He then saw the victim on the ground and Angie said that the victim had it coming. Angie then moved the victim's body looking for shells. She gave the gun to defendant. When she did, he was afraid she might shoot him as well. He cleaned the gun and gave it back to her. Afterwards, they went to Angie's house, smoked some marijuana, and had sex "to keep it cool."

Finally, defendant stated that he was on "a lot of drugs," and that the victim had stolen from him and his children. He said that the victim as "just a bad person." Defendant admitted that he "did do it," but he was on drugs. He then stated that they were going to take the victim home but did not. He did not think he would do it, that he would just "bluff" her, but "it happened."

Defendant told Detective Ford and another investigator who had joined them during the interview, that on the drive to Deep Creek, he sat in the back seat with the gun in his lap. The victim knew defendant had a gun. Angie had given him the gun the day before. After they got to the Deep Creek area, Angie and the victim got out of the car and argued. Defendant accused the victim of stealing from him; she denied it. The victim told defendant that even if they let her go, she would still "get [defendant] hurts." Defendant thought the victim was "crazy" and that her family would hurt him or his family. The victim told him to do it if he had the "balls." Defendant then shot the victim in the neck. Angie told defendant that it was only a .22, and the victim was still alive. He then shot the victim again; this time in the head. Defendant gave the gun to Angie.

7

He said that he did not know what she did with it. He believed Angie "threw it on the side of [his] house."

Defendant did not present a defense.

## III

## ANALYSIS

After defendant appealed, and upon his request, this court appointed counsel to represent him. Counsel has filed a brief under the authority of *People v. Wende* (1979) 25 Cal.3d 436 and *Anders v. California* (1967) 386 U.S. 738 setting forth a statement of the case, a summary of the facts, and potential arguable issues, and requesting this court to undertake a review of the entire record.

We offered defendant an opportunity to file a personal supplemental brief, but he has not done so. Pursuant to the mandate of *People v. Kelly* (2006) 40 Cal.4th 106, we have conducted an independent review of the record and find no arguable issues.

# IV

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI

Acting P. J.

We concur:


KING

J.


MILLER

J.